This case presents a question critical to Illinois students and families and teachers. Can a religious institution be held responsible for retaliating against an educator who contacts the police to report criminal activity? Or are such institutions in a bubble that completely insulates them from accountability for their actions? The Circus Court below tells that school principal Mary Rehfield's retaliatory discharge in Illinois Whistleblower Act claims could not proceed against the Diocese of Joliet as a matter of law because, number one, Ms. Rehfield had a contract with the Diocese and therefore could not avail herself of the retaliatory discharge tort. And number two, it believed that it had to abstain from the entire case because Ms. Rehfield's employer was a religious institution. Let me just ask you one question with respect to the Whistleblower Act. At least my understanding, and you can correct me, a conventional whistleblower case is when somebody reports that their employer is doing something illegal. It can be that, but the Illinois Whistleblower Act provides that an employer cannot retaliate against an employee for disclosing information to a law enforcement agency when the employee has reasonable cause to believe that the information discloses a violation of law. So it is not premised on a requirement that the violation be something that the employer is doing wrong. I'll first address the scope of the retaliatory discharge tort and then I'm going to move to the ecclesiastical exception and ministerial exception issues. A defendant fired my client, a school principal, for reporting a parent's threatening conduct to police. Ms. Rehfield was forced to leave the school, leave behind her students and her responsibilities and not return. At the time that she was fired, the 2016-17 school year was underway. She was not permitted to continue that school year as principal. Also at the time that this happened, she had already been given and accepted a contract for the following school year, 2017-18. She was not permitted to perform the functions as principal at all for that school year. Was she reimbursed? She was paid for the contract, Your Honor. That's true. She was paid. But pay is only one component of the employment relationship. She alleges in her complaint that she was significantly harmed by not being able and permitted to return and do her job. The contract that she had with the diocese, which is in the record at C-185 and then the Both of those say that the diocese agreed to pay her in consideration for serving as chief administrator of the school and performing duties and responsibilities commensurate with the office. She was not permitted to do that. And on the retaliatory discharge piece, much like the Supreme Court held in the Midget case, which dealt with employees who were under collective bargaining agreements, simply reverting to contract remedies is not sufficient for someone who is discharged in violation of the public policy of the state of Illinois. Having that tort of retaliatory discharge is a separate and important remedy for employees who are retaliating against the law because they can, for example, seek punitive damages, which is an important deterrent against the kind of conduct that defendant engaged in in the Midget case and the kind of conduct that's issued here. So the only damages left in your case would be punitive damages? For retaliatory discharge, yes. There are different remedies. And I'm trying to recall if we also saw any other emotional distress types of damages. But punitive damages are an important component of that. And that is an important part of Ms. Rayfield's case. It was devastating to her personally that this happened to her. But it also struck a chord of fear that she had not only on behalf of herself, but for the teachers who worked under her, for other teachers in the state of Illinois. How do we know that? Well, Your Honor, we don't because the court dismissed this on a 2615 motion. But in our complaint, we do plead. You allege it, then? We do allege it. You just said it was certainty. That's what I was wondering. Well, yes, Your Honor. The plaintiff makes allegations in her complaint, which a court must take as true at the motion to dismiss stage. Yeah, for the court procedure. But I was just wondering as an absolute fact. We don't know yet. We don't know what my client believed? No. Did you say she believed it? Well, Your Honor, she did believe it. This was something that was of great concern to her. And in terms of the importance of proceeding and allowing her to proceed on a retaliatory discharge, the fact that a case like this could be dismissed without hearing any of those things, without hearing any of that evidence, would send a message to people in maybe Ms. Rayfield's position and other teachers' position that if they do pick up the phone and call the police. If there were evidence to support that allegation, yes. Yes, Your Honor. And we intend to supply evidence to support that. This is an argument that I should be making one day to a jury who will have heard the evidence in the case and will be able to evaluate it. That's what I was suggesting. Yes, Your Honor. We're not a jury. Yes, Your Honor. The argument that the circuit court adopted in terms of just the retaliatory discharge claim was that because Ms. Rayfield had a contract and was not an at-will employee, she could not sue for retaliatory discharge. But that is not the law in the state of Illinois. The courts in Illinois have expressed reluctance regularly to expand the retaliatory discharge court to cover non-discharge scenarios. So if Ms. Rayfield were suing for a retaliatory demotion or for a retaliatory failure to renew a contract, she would lose. But that is not the claim in this case. The claim is that she was fired. She was fired in May 2016. She has a claim that the school failed to renew her contract. In fact, it had renewed her contract. The problem is that it terminated her. It prevented her from returning to the school and allowing her to fulfill either of those terms. Generally, she held a position where the school could terminate the employment relationship at any time. Based on positions she held. No, it had the ability under the contract to terminate her basically for good cause, for just cause. The contract provided, and again this is at 185 and 187, that she could be terminated at any time for justifiable cause. And that again, that's the same language that was at issue in the Midget case before the Supreme Court that was dealing with union members who were protected by collective bargaining agreements. The way that the Illinois Supreme Court analyzed the issue in Midget, it was characterizing the plaintiffs as employees with contracts akin to Ms. Redfield. To deal with that case and that line of case law, the defendant distinguishes my client by saying that she had a contract with a defined duration. But the appellee's perspective here, why does that matter? Why should someone whose contract has a defined duration have less opportunity to press a retaliatory discharge claim than someone whose contract requires that they can't be terminated other than for just cause? Well, let me add, because it just seems that, I mean, religious institutions can do things that others can't. And for example, it's public policy in this state of same-sex marriages, right? Yes. But if you're a principal or a teacher at a Catholic school and you marry someone of the same sex, can't that Catholic school say goodbye? They can, Your Honor, and that brings us to the second… And a private employer couldn't do that, right? That is correct, and that's because under the federal ministerial exception, which the United States Supreme Court recognized in 2012 in the Housiana-Tabor case, employment discrimination laws, like those in Title VII or under Illinois law, do not apply to religious institutions when the person at issue qualifies as a minister under the law. And that is an exception to the usual rules that apply. The issue here, though, is that this is not an employment discrimination case. This is a whistleblower retaliation case. And when the Supreme Court decided Housiana-Tabor, it specifically and very clearly said that its decision to affirm the ministerial exception and to recognize that under the law was limited to the employment discrimination context. And it specifically said that it left for another day whether cases in other situations like this one would also fall under that exception. And it's very instructive to listen to the oral argument or read the transcript of oral argument in the Housiana-Tabor case because the justices were focused on types of cases like this one. What if a teacher reported sexual abuse to the police? Would that be out of the box because of the ministerial exception? And even the church's lawyer said, no, that would be a different situation. And there was a lot of discussion about that. Justice Sotomayor noted the societal interest in encouraging reporting to authorities and said to the church's lawyer, if we define the ministerial exception in the way you want, we take away the incentive for reporting. We actually do the opposite of what society needs. And in the final opinion on that, the Supreme Court made it clear that the exception it was recognizing was narrow. Illinois has not dealt with this since Housiana-Tabor. The Illinois Supreme Court has not addressed the ministerial exception at all. There aren't any Illinois cases saying that the ministerial exception applies in a whistleblower retaliation case like my client's. And there is no reason for you to expand beyond this exception, beyond what the United States Supreme Court recognized, which is what the defendant was asking you to do here. Well, the Supreme Court didn't decide this kind of case. No, the Supreme Court was dealing with an employment discrimination case, and that's not what's happening here. So we're in the case that the Supreme Court asked some questions about, but didn't decide. That's correct, we are. And there is every reason under the public policy of the state to allow a case like this to proceed. This is why, in Palmeteer, the Illinois Supreme Court authorized the tort of retaliatory discharge in the first place. It is an exception to the usual rule that employees can be terminated for any reason or for no reason. That's the general rule. The exception is a narrow one to say when people are fired for an illegal reason that's against the public policy of the state, they should be able to proceed on that because we want to deter employers from doing that. And the alleged exception, based on the fact that it's a religious institution, how does that play into that section? Yes, so there are two doctrines that have been discussed in this case. The ministerial exception is the one that I just described and presented to you before. There is a separate doctrine... And that's the one that the Supreme Court has left open. Yes. There is a separate doctrine under Illinois law called ecclesiastical abstention. And what that basically means is if a problem or a complaint is going to require judges of the courts of Illinois to mix and mingle in church doctrine and analyze church doctrine and make decisions about church doctrine, the Illinois courts have said we're staying out of that. We would abstain. But if a case does not present issues of church doctrine and the court can decide the matter purely on secular issues, then ecclesiastical abstention is inappropriate. And here, although the circuit court judge said that he believed he must abstain from exercising jurisdiction over the whole complaint, that was the error. There is nothing in Ms. Rayfield's case that will require the court to interpret canonical text or otherwise engage with church doctrine. This case has nothing to do with religion. It has nothing to do with the fact that... If I'm reading the cases I've read on this doctrine, which doesn't come up a lot but comes up infrequently, but it's still being, you know, there are recent cases in the last 10, 15, you know, like on this doctrine that they say we're hands-off on this issue. And it seems to be a broad sort of concept. Well, there are other cases that are hands-off. I'll give you an example, which is Biven v. Ray. 275 Pellatt III, 899, and that's from 1985. That was a case that a couple, a married couple brought against a church based on conduct by the reverend of the church. He was literally a minister, and the claim was that in his capacity as reverend while conducting marital counseling for the plaintiffs, he initiated a sexual relationship with the wife. The court held that ecclesiastical abstention was inappropriate in that case because it had nothing to do with religious beliefs or practices. And it didn't matter that in that case the religious person was indisputably a minister. That did not matter. And so here there has been or could be dispute about whether Mary Rayfield qualifies as a minister under the law, but her position in this case below and on the field here is that it doesn't matter. First, for ministerial exception purposes, this is a case that is wide open for the courts to consider in Illinois. And under ecclesiastical abstention, this is not a case that requires the court to get involved in doctrinal matters at all. This case is much closer to a case like that than the other cases that we cite. I mean, the schools teach religious teaching in school. Sure. And she's the principal or head of the school. Right, but there's no... The plaintiff's claim in the complaint is that she was terminated solely based on her report to police of a crime. The defendant has submitted some declarations in this case on the issue about whether she's a minister, but they have not contested the allegations in the complaint that she was fired for reporting a crime to police. And here's our point. Whether she's a minister or not should not matter. It does not matter under ecclesiastical abstention, and it doesn't matter under ministerial exception. It can't be that religious schools are wholly insulated, wholly insulated from this type of claim. Employment discrimination claims are different. If somebody says, you know, you've changed religion, you are no longer Catholic, you're now Jewish, we don't want you leaving our school, that's different. We would lose that case. Well, but you can say, we don't like your socks. And if the contractor, and you're out of here, don't like the socks you're wearing today, goodbye. But then they would have to pay it. That would be a breach of the contract, I guess, because they're saying that's not just cause. And the remedy in that case would be you pay the person what they were due under the contract. I just think, would you agree with this? I mean, the church can still fire the employer, fire an employee for virtually any reason except a wrong reason and one that's prohibited by law. And in your case, you're saying it wasn't appropriate. Yes, and I'd be happy to elaborate on that in my rebuttal if you have further questions. Thank you. Is it, Mr. Anna, is it Anna Clariel? It is, yes. Good morning. Good morning. Mr. Court, counsel, this is not an undeveloped body of jurisprudence that we're dealing with here. But even more fundamentally, the position that I'm advocating on behalf of the Catholic Diocese of Joliet this morning is that the circuit judge was justified in the rulings he made on two independent, equally sufficient bases. The first being, and we believe the more fundamental being, that the First Amendment and the Fourteenth Amendment of the U.S. Constitution, as well as the incomparable provisions of the Illinois Constitution, absolutely safeguard religious institutions that are established as the Roman Catholic Church is against secular interference in employment decisions when those decisions involve ministerial employees. So you're arguing the second issue first? I think it's the most important, so I am. I can address them in whatever order you want, please. Well, if you want to go to that one, fine. There's been a significant amount of muddying of the water that has occurred on appeal and in the briefs in the trial court. And I think the effort has been made in order to show your honors that as a matter of public policy, which at the end of it, you have to balance. There is a dangerous precedent to be set here. If someone in Mary Rayfield's position is punished for making a report to the police of criminal activity, I make note of it, my opponent's argument in opening, and she said that several times. She also said that Mary Rayfield was reporting threatening statements, threatening behavior. We go back to basics. Most fundamental to our jurisprudence is that your honors decide cases on their particular facts. And the particular facts of this case include an allegation by Mary Rayfield, we have to live with them, so does she, describing an incorrect article in the Naperville Sun. She says, the story stated inaccurately that on February 7th, McKinnon, the caller, left a message for Rayfield threatening to terrorize the school and its staff. Her very next allegation in paragraph 24 of the amended complaint that Judge Rossi dismissed, the article was wrong in several respects, including that the voicemail was to Father Bacner, not to Rayfield, and that in the message, McKinnon did not vow to terrorize St. Raphael. The message certainly concerned Rayfield, and she took it seriously, but it was not accurate to cast it as a threat to the school and its staff and its students and staff. So Mary Rayfield's pleading, the one that Judge Rossi was evaluating under the applicable standards of 2615 and 2619, denied that this caller, whom Mary Rayfield was reporting to the police, was threatening anyone. So this parade of horribles that you see here... Are you really characterizing her allegation correctly? Because it certainly appears that she's alleging it was a threat to her and it was in her position, based on her position at the school, right? She really isn't. She says that the phone call was made to Father Bacner, her boss. She says that it was a rant. She describes it as a rant about priests and the church. She doesn't say it was threatening. She says she perceived it as threatening, but it wasn't a message left for her. And then, according to her complaint, it was mischaracterized in the press, and she says that it was not accurate to cast it as a threat to the school and its students and staff. That's what she says. Well, there's a whole series of allegations she makes, which appears to be upsetting about the calls and the nature of the calls. Yes. And that they were... I mean, just the whole pleading is that they were aggressive calls. They were aggressive calls. But according to her, they were not threatening. I mean, you're taking that one interpretation of a letter out, but there's a whole series of allegations. There's a whole series of allegations in the complaint. There is, but none of them say she was reporting a crime. None of them say she was reporting threats to students, school staff, or personnel. How would you characterize the description? She describes them as angry rants. No, I mean the description of what he was... Yeah, the total description of what was said. I don't have more detail, nor did Judge Rossi, about the particulars of the message that this caller left. What I'm really driving at, Your Honor, is that when Ms. Rayfield's counsel says that she should be protected in making a report like this, and then encourages Your Honors to consider the safety of students in schools and the abuse of students, and all of the terrible things we've read headlines about, I believe it's critical to understand that's not what happened here, according to Mary Rayfield. Okay, well let me just make sure we're on the same page about this. Would you agree with opposing counsel that, hypothetically, if a Catholic school employee called the police and said somebody, some other employee here at school is molesting kids, that they couldn't be fired, and they were fired for calling the police about that? Would that support a whistleblower lawsuit? Recognizing that the hypothetical's got nothing to do with the facts before this court, I think the first inquiry that would need to be made under the First Amendment, and the ministerial exception is, who was making the report? There's no question or doubt that churches and other religious institutions face civil liability for the torts of people whom they put into positions of authority and who then violate that trust. There's just no doubt about it. The ministerial exception, ecclesiastic abstention, has never insulated churches, as we know, by picking up any paper from the torts of people such as pedophiles. But I'm talking about the person that reports the pedophile to the police. If the church fires that person for reporting that, would that give rise to a whistleblower? I don't know of precedent that addresses it, but I think it would still be critical to assess whether the reporting employee was a ministerial employee. Well, look, don't people send their kids to Catholic schools, basically look at all the teachers? The reason you send your kids to Catholic school is because you give them some religious education, but also even the teachers that aren't specifically teaching Catholic doctrine are also teaching, by example, the lessons of the church. Isn't that what Catholic school is all about? To some extent, don't we look at all teachers in Catholic school as serving a ministerial function? Yes, and I think the case authority underlines that, and that's particularly the case with respect to people in leadership positions. Mary Batefield, being the principal of that school, had, among her most critical responsibilities, religious education leadership. That's what makes her a ministerial employee. There's a procedural thing here that's important. Mary Batefield didn't file a verified complaint. Fine, no obligation to do so. But when we filed our original motion to dismiss under Combined 2615-619 motion, we filed affidavits from Father Bachner and from Nancy Seaman. Both of those affidavits established first that Mary Batefield was a contracted employee for a specific term, and second, that she was a ministerial employee because among her most critical job responsibilities was religious education leadership. Mary Batefield is the plaintiff. She could have filed her own affidavit saying, no, that's not true, my responsibilities were predominantly secular. Well, the ruling here is a 615 motion, isn't it? It's a 619 and 615 motion. You presented it, but the way the judge ruled gave the impression that it's a ruling based on the validity of the complaint. Respectfully, I don't think that's accurate with respect to the ministerial exception because the complaint neither denies nor affirms her ministerial status. That's why I filed the affidavits, because it is affirmative matter. Procedurally, Mary Batefield's complaint did not say, I had ministerial duties. I don't remember anything in this record saying the judge ruled on the affirmative matter, that it was the affirmative matter that the judge was ruling on. Did I miss something? At the very end, his ruling was extremely concise. He said, The court abstains and must abstain from exercising its jurisdiction over both of the plaintiff's claims in accordance with the doctrine of ecclesiastic correspondence. Plaintiff was employed in a ministerial role as a spiritual and educational leader of St. Raphael School and as such being responsible for the instruction, development, and implementation of Catholic religious programming for both students and staff, the implementation of diocesan principles, and the religious growth of school staff. The finding that he just made was predicated on the affidavits that were filed in support of the 619 prong. Otherwise, I'm sorry. In answer to my previous question, are you saying if one is a ministerial employee and that ministerial employee reports that somebody else, that somebody is molesting kids, for example, which hopefully we all agree has nothing to do with church doctrine, has then, that person can't be, that person could be fired and would not have, under Illinois law, a whistleblower claim. Because they're a ministerial employee. I think under those facts, if there were roles reversed, and the appellant in this case were arguing those facts, I think that they would have a compelling argument that there's a substantial state interest in enabling the whistleblower claim. But that's not this case. It never was. If that's the case, that would have to fit under the kind of doctrine she's talking about with regard to the first issue. So how can it be correct in that scenario and not correct in her scenario? Well, Justice Schmittman made reference to the customary understanding of a whistleblower being somebody who reports criminal conduct from the inside rather than a threat from the outside. Well, that's my point. That is traditionally the case. And so that would be the more typical setting. So it's reporting an alleged criminal offense, either, in his example, it's in the inside, it's with one of the employee's teachers. Her allegation is with regard to something coming in from the outside that is alleged to be criminal behavior for the purpose of this argument, correct? Correct. Even the allegations of her complaint do not say that what he was doing was criminal behavior versus a rant about priests in the church. That's as specific as it gets. So if we twist the facts and say that this ministerial employee reports that, say, one of the big donors, not a member of the school staff, but a parent of a child in that school and happens to be, let's say, a major contributor to the conference of the church and the school, is molesting his or her own son or daughter, so that somebody on the outside reports a crime by somebody outside, say, and got fired for that, do you think that would support a whistleblower act? I think it very well could. Again, we are into facts that have nothing to do with the case before you. But if I were arguing counsel's position in the case with the facts you just described, one of the things I would say is that, for years, the Abused and Neglected Child Reporting Act has mandated certain reporters, including school personnel, make reports when they have information to that effect. As you well know from a lot of the common law retaliatory discharge cases, it is printed with a statutory basis that underscores the public policy supporting the report. In that situation, you would have a specific statutory mandate for reporting that would dovetail, complementary in fashion, to a whistleblower cause of action. But that's not the case, and it never was. Mary Rayfield, for purposes of the circuit court, was indeed a ministerial employee. When counsel says that you need to embroil yourself, when the circuit judge would not need to, in order to adjudicate her claims, that is a gross misstatement of the reality of the trial of this case. Because, in a retaliation case, which is just one species of discrimination case, all retaliation cases is a discrimination case against somebody who makes a protective report. The employment discrimination law on that subject is absolutely crystal clear. In that situation, where a report is made, the individual can't be punished for it. If they are a ministerial employee, there is no way for a jury or a judge to determine the facts. Why was this person let go? Were they let go because they no longer had the faith or confidence of the priests in the parish community, with lawful and legitimate reason? Or were they let go because they were making a protective complaint? There is absolutely no way out of what Justice Linton described as the quagmire of religious doctrine for any judge or jury to sort out the motivation for this alleged retaliatory discharge without approaching on religious doctrine and the most fundamental right that any church has, to pick who will speak for it. Mary Rayfield was picked to speak as the highest-ranking Catholic educator in St. Raphael's School, reporting directly to the parish priest. The school's prerogative, the church's prerogative, the diocesan prerogative, was to decide she could be removed without secular scrutiny of the motivations for its decision. If she were a janitor, if she were somebody else in another capacity where she wasn't imbued with ministerial duties, the story would be different. But again, those aren't these facts. These facts are of a ministerial employee whom the school and the diocese had the right to discharge and did so free of intervention from the court in a secular tribunal. I apologize for going over. No, we were kind of hammering you with questions. That's okay. I thank you. And as a result, I'm requesting that Your Honor affirm the judgment of the circuit court. Ms. Porter, St. Raphael. Thank you. It should not be and the law cannot be that someone in Mary Rayfield's position has to go find the janitor to report to the police when she fears a threat against a member of the school community. And our complaint does allege precisely that. Paragraph 20 of the complaint alleges that a threat was made and that to the extent it was a threat, it was to Father Hockner and not to the school as a whole, that Ms. Rayfield was concerned. She immediately contacted the police and that the police, based on that activity and based on that voicemail, issued an arrest warrant. It was clearly a report of criminal activity that led to a criminal prosecution. That's what then caused information to come into the public record, into the newspaper article. And yes, we do allege that the newspaper article got some facts wrong. It hyperbolized the situation and presented it as somebody's coming to massacre the school. It was not that extreme. But nevertheless, it was a threat that was of a criminal nature, which is why she called the police as opposed to someone else. And as the defendant distinguished in their brief, that was the one occasion where she didn't check in with the various supervisors, with the pastor, before she did that because she perceived it as so urgent. So make no mistake. The hypotheticals that you presented to my opponent, those are exactly what this case presents. The fact that it was a threat of harm to someone as opposed to sexual abuse to a child, that is a distinction without indifference. When there is a threat of harm that someone reports and they are making a report to police, that is in the heart of the public policy that the Illinois Supreme Court recognized in Palmatier as giving rise to a retaliatory discharge tort. The fact that it arises in the context of a religious institution, whether it's the janitor, whether it's the pastor, this is not about discrimination about who should speak for the church. This is about can we really put religious institutions in the type of bubble? On counsel's point, you've got maybe two factors co-exist. Some things aren't mutually exclusive. For example, somebody makes this report of a crime, but then for other reasons, the church leaders decide for a number of reasons, we're just not happy with and church members aren't happy for whatever reason, we choose not to have this person in that position in a ministerial position. Since they're not, how do you sort those out? Under the law, is a jury allowed to do that? They are. The ministerial exception is in a permanent defense. In this situation, Ms. Rayfield pled multiple facts to support her contention that she was fired because of the report to police. We plead in the complaint that she was beloved at the school. Children referred to her as Mrs. San Rafael. She had just been nominated by her superiors as principal of the year. She had already been given a contract for the coming school year. She had had conversations with the pastor repeatedly about remaining until age 70. All of these are things that we would introduce as evidence to support our contention that the only thing that changed in the scope when the school decided to fire her was days after this whole incident came up with the school. It was in retaliation for her report to police. They did not like that. They wanted a state vote and that was Mary Rayfield. What was the threat? Opposing counsel has made much of this. Is there hyperbole on both sides here? I'll tell you what our complaint says which is the operative allegation at this point. It says in paragraph 20 that Father Bochner, who is Ms. Rayfield's supervisor, received a voicemail from a person later determined to be McKinnon. It was a several minute long rant about priests and the church. To the extent that it was threatening, the threat was to Father Bochner. When Rayfield learned about the voicemail, she promptly contacted police and requested that they review the matter. The police issued an arrest warrant for McKinnon. Then the complaint goes on to describe what happened next. But it was clearly something that concerned her enough to report it to the police as a threat and it was something that the police found it constitutes criminal conduct for which they issued an arrest warrant. So you're saying the Whistleblower Act in the area where the United States Supreme Court hasn't decided trumps any exception regarding the second argument? The ecclesiastical suspension issue is different. But under the case law that we cite in our brief, this is clearly an issue that courts can decide without getting entangled into church doctrine. The fact that there may be a mixed fact issue about why did they fire her is not the same as grappling with church doctrine. And the case law that we cite there addresses that. We urge this court to rule that consistent with the public policy of this state, teachers will not lose their jobs if they report a crime to law enforcement whether or not they happen to work for a religious school. It is a critical issue in your hands. We ask that you reverse the circuit court, that you reinstate Ms. Rayfield's claims and that you remand this case for further proceedings. Let me ask you this. You mentioned, you read that thing, you said that the threat was to the priest, the voice message to the priest as opposed to the school itself or the school children or the teachers that sometimes come in there and shoot up the school. Well, the complaint and also... Well, first of all, does that matter? No. What Ms. Rayfield was concerned about is that there was a threat that was applying and she was reporting it. We do further allege in paragraph 40 in contacting the police about McKinnon's threats, Rayfield did what she believed was the right thing to do to protect her students and necessary under the law. She perceived this as a safety issue, which is why they were in touch with the police in the first place. We also have allegations about whether to contact parents, whether to put photos of this man who's making the threats in public places. That's the stuff that happened afterwards. Yes, but the specific... No, before the voicemail, Your Honor. Before the voicemail, but... The specific answer to your question is no. Even if it had been... It really doesn't matter what the crime was, whether it was a threat, whether there was a arson. I mean, any crime that somebody is reporting to the police shouldn't be protected under the public policy of Illinois. Paul Mateer did not draw distinctions, you know, well, these kinds of crimes are important and those aren't. The Illinois Supreme Court speaks in very broad language about this being among the most important public policies of this state to encourage citizens to report criminal conduct if they see it. As they see it? Yes. Okay. Yes, Your Honor. Thank you very much for your time. Okay. Thank you both for your arguments here today. The matter will be taken under advisement. The rest of this position will be issued at...